IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Anna P. Grant,                          :
                                        :      Case No. 1:04-cv-798
        Plaintiff,                      :
                                        :
vs.                                     :
                                        :
Montgomery County                       :
Commissioners, et al.,                  :
                                        :
        Defendants.                     :


ORDER

        Before the Court are several motions for summary judgment
filed by various defendants.  The pending motions are from The
Resident Home (Doc. 80); Montgomery County Department of Mental
Retardation and Developmental Disabilities (Doc. 85); Hamilton
County Department of Mental Retardation and Developmental
Disabilities (Doc. 91); and the Montgomery County Commissioners,
Montgomery County Children Services Board and other Montgomery
County entities (Doc. 83).  Plaintiff has responded to each of
these motions (see respectively Docs. 99, 101, 102 and 103) and
filed an affidavit of her counsel, Thomas Koustmer, attaching
documents obtained in discovery (Doc. 104).  Each Defendant has
filed a reply (see respectively Docs. 115, 109, 111 and 105).
The defendants also filed a joint motion to strike the Koustmer
affidavit and its attachments (Doc. 108).


Factual Background

        Plaintiff Anna Grant was attacked, assaulted and raped in

-1-

her own home on August 14, 2003. There is apparently no dispute that her attacker was Jason D. Turner, who at the time was a neighbor of Ms. Grant's. According to Resident Home's motion, Turner pled guilty to aggravated burglary, aggravated rape, kidnaping and attempted rape, and was sentenced to 25 years in prison. (See Doc. 80, p. 3.)

Mr. Turner is the adopted son of Viola Turner. The record reveals that Mr. Turner has a low IQ, sub-standard educational skills, and is mildly retarded. In June 1998, when Turner was 14 and living with his mother in Dayton, Ohio, he was charged with the assault and rape of a 62 year old woman who, at the time, was a neighbor of Turner's. The Montgomery County Juvenile Court, Judge Kuntz, found Turner was incompetent to face the charges. Due to Turner's age, status and condition, in November 1998 the Court ordered that Turner be placed in a secure treatment facility, Fairfield Academy in Thornville, Ohio. (Doc. 94, Exhibit A, Juvenile Court Order of Nov. 4, 1999.)

Montgomery County MRDD first became involved with Turner when the Montgomery County Juvenile Court ordered it to be the lead agency and supervise Turner's treatment. (Doc. 94, Exhibit B.) MRDD caseworker Donna Blackburn assisted the Court in locating Fairfield Academy as an appropriate placement for Turner. Blackburn and her associate monitored Turner's course of treatment at Fairfield, and helped secure the funding for his placement through a county agency called ICAT. (See Blackburn Affidavit, Doc. 85, Exhibit C.)

Judge Kuntz eventually found that Turner was incompetent to stand trial for the charges against him, and dismissed the charges against Turner. (Doc. 94, Exhibit G.) And in December 1999, Judge Kuntz granted temporary custody of Turner to Montgomery County Children Services. Mallory Mitchell was the MCCS caseworker assigned to Turner from December 1999 to November 2002. (Doc. 107, Mitchell Affidavit ¶2.) Turner's mother, Viola Turner, died shortly thereafter in January of 2000 while Turner was still at Fairfield. (Doc. 97, Mitchell Affidavit at ¶8.)

In November 2000, Turner was discharged from Fairfield at the request of MCCS. (Doc. 107, Mitchell Affidavit) The Fairfield discharge summary notes that Turner had made some progress during his two years at Fairfield, but the school was unsuccessful in returning him to competency. Fairfield staff concluded that Turner's risk of repeating a sexual offense was low with supervision, and moderate without supervision. (Doc. 107, Exhibit A, p. 5.) Mitchell's Affidavit in this case states that MCCS was concerned that, once Turner turned 18, he would have to leave Fairfield and would be unprepared for semi-independent living. Ms. Mitchell attempted to place Turner in different agencies but was unsuccessful due to his functional deficits. (Doc. 107, ¶11-13.) She was also concerned that Turner would not do well in a group home.

Beacon Agency, a private company that apparently contracts with public agencies to provide foster care services, located a certified foster care provider who was willing to accept Turner

-3-

into her home.  According to Mitchell, the foster mother, Donna
Carlisle, had experience in dealing with low functioning sexual
offenders such as Turner.  (Doc. 107, Mitchell Affidavit ¶13-14.)
The Montgomery County Juvenile Court expressly approved MCCS'
request that Turner be placed into a permanent residential
arrangement.  (Doc. 94, Exhibit K)

Turner started living with Donna Carlisle at her home in
Hamilton County, Ohio in November 2000.  The defendants state,
and there is nothing in the record to contradict their statement,
that Ms. Carlisle was fully informed about Turner's background,
his prior offense, and his legal and treatment history.  Even
though Ms. Carlisle (also referred to as Ms. Carlisle-Byrd) lived
in Hamilton County, MCCS remained Turner's legal guardian and
monitored Turner's status and progress.  (Doc. 107 at ¶16.)

In September, 2001, Montgomery County MRDD stopped providing
services and funding for Turner and referred him to the Hamilton
County MRDD.  Michael Cooper, a caseworker with Hamilton County
MRDD, was assigned to Turner.  Cooper met with Turner, and
completed individual service and educational plans for him.
(Doc. 114, Cooper Affidavit, Exhibits L-2, L-4 and L-5.)

On December 6, 2001, Turner reached his 18th birthday.[1]  MCCS
filed to terminate Turner's case with the Juvenile Court on
August 13, 2002, and their custody of Turner was formally
terminated by that Court on November 7, 2002.  (See Doc. 83, p.

---

[1] Turner's birthdate is listed in some records as 1984.
Montgomery County's motion asserts the correct date is 1983, and
the subsequent timeline of events supports this conclusion.

-4-

3.)  By that time, Turner had been living with Ms. Carlisle for two years, and there is nothing in the record suggesting that Turner had any contact with the criminal justice system during that time.

After Turner's emancipation (and his resultant ineligibility for county-sponsored foster care services), Turner told Cooper he was interested in adult services provided on a voluntary basis through MRDD, but that he wanted to stay with Carlisle. According to Cooper, Turner began receiving services through a program called "SAIL" provided by The Resident Home ("RHC"), a private agency under contract with Hamilton County MRDD.  Michael Rench, current Director of Community Services for Hamilton County MRDD, explains in his affidavit that the SAIL program provides support services for individuals who are no longer eligible for foster care.  Hamilton County MRDD contracts with RHC to provide these services, and RHC sub-contracts with a family to provide a foster care-like setting and support.  (Doc. 95, Exhibit K.)  Ms. Carlisle was qualified as a provider for the SAIL program.  Ms. Carlisle was apparently willing to have Turner stay in her home, as he remained there until he attacked Ms. Grant in August 2003.

Plaintiff's Fourth Amended Complaint (Doc. 58) contains two causes of actions against all of the defendants, for negligence per se under Ohio law, and for violation of her federal constitutional rights under 42 U.S.C. §1983.

DISCUSSION

Summary Judgment Standards

-5-

The standards for summary judgment are well established. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253 (1968)). The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. den., Superior Roll Forming Co. v. InterRoyal Corp., 494 U.S. 1091 (1990). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant

-6-

and draws all justifiable inferences in the non-movant's favor.
United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and
determine the truth of the matter, but to determine whether there
is a genuine issue for trial. Anderson, 477 U.S. at 249. The
court must assess "whether there is the need for trial — whether,
in other words, there are any genuine factual issues that
properly can be resolved only by a finder of fact because they
may reasonably be resolved in favor of either party." Id. at
250. "If the evidence is merely colorable, . . . , or is not
significantly probative, . . . , the court may grant judgment."
Anderson, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution
since it operates to deny a litigant his day in court, Smith v.
Hudson, 600 F.2d 60, 63 (6th Cir. 1979), cert. dismissed, 444
U.S. 986 (1979), the United States Supreme Court has stated that
the "[s]ummary judgment procedure is properly regarded not as a
disfavored procedural shortcut, but rather as an integral part of
the Federal Rules as a whole, which are designed to 'secure the
just, speedy and inexpensive determination of every action.'"
Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations
omitted).

Plaintiff's Federal Claims.

Municipal liability for due process violations under 42
U.S.C. §1983 must be premised on the allegation that a municipal
policy or custom deprived plaintiff of her constitutional rights.

-7-

See generally, <u>Monell v. Dept. of Social Services</u>, 436 U.S. 658,
694 (1978).  Plaintiff's Fourth Amended Complaint and her
responses to the defendants' pending motions do not articulate
any municipal policy or custom that deprived her of her rights.
Giving Plaintiff's arguments a very broad interpretation, they
could be read to suggest that the municipal defendants had a
policy of placing low functioning sexual offenders in community-
based residential foster care homes, a facially lawful policy.
As noted in <u>Stemler v. City of Florence</u>, 126 F.3d 858, 865 (6th
Cir. 1997), under those circumstances Plaintiff "must demonstrate
that the municipal action was taken with 'deliberate
indifference' as to its known or obvious consequences.  A showing
of simple or even heightened negligence will not suffice.  . . .
'Deliberate indifference' is a stringent standard of fault,
requiring proof that a municipal actor disregarded a known or
obvious consequence of his action."  (internal quotations
omitted).

The facts in the record demonstrate that, at the very worst,
MCCS might have been negligent in seeking to place Turner into
residential foster care, and seeking Court permission to remove
him from Fairfield.  There is no evidence that raises a
reasonable inference that MCCS, or any of the other moving
defendants, acted with "deliberate indifference" to the possible
consequences of placing Turner in the less restrictive
environment of the Carlisle home.  Rather, the record
demonstrates that the decision was made based upon a variety of

-8-

factors, and primarily out of the conclusion that residential placement offered the best chance for Turner's rehabilitation. Plaintiff offers no evidence that other youthful offenders placed in less restrictive surroundings committed repeat offenses, such that the defendants should have been on notice that their plan for Turner would create a serious risk of harm to innocent third parties.

In addition, a municipality does not have a general constitutional duty to protect its citizens from violence by non-governmental third parties.  Nor is a municipality liable for the negligence of its employees.  See <u>DeShaney v. Winnebago County Dept. Of Soc. Serv</u>., 489 U.S. 189, 195 (1989).  There are, of course, two recognized exceptions to the <u>DeShaney</u> doctrine: the existence of a special or custodial relationship between the municipal actor and the victim, and the state-created danger doctrine (which Plaintiff calls the "snake pit" theory).

MCCS had legal custody of Turner for approximately three years, and had a special relationship with Turner at least for the period of his legal custody.  However, there is no special relationship between MCCS or any of the other defendants, and the plaintiff Ms. Grant.  The first <u>DeShaney</u> exception does not apply.

To properly establish a state-created danger theory of due process liability, Plaintiff must plead (1) an affirmative act by the municipality that creates or increases a risk that Plaintiff would be exposed to private acts of violence, (2) a special

danger to Plaintiff, as distinguished from a risk affecting the
general public, and (3) that the defendants knew or should have
known that their actions specifically endangered Plaintiff.
McQueen v. Beecher Community Schools, 433 F.3d 460, 464 (6th Cir.
2006), citing Kallstrom v. City of Columbus, 136 F.3d 1055, 1066
(6th Cir. 1998).

There is no doubt that MCCS affirmatively acted when it
asked the Juvenile Court to approve Turner's discharge from
Fairfield and his residential placement with Ms. Carlisle.  But
that act took place almost three years before Turner attacked
Plaintiff.  Inherent in the affirmative act requirement is some
reasonable temporal or proximate relationship between the state's
affirmative act and the risk of harm it allegedly creates.  A
failure to act is not sufficient to establish municipal
liability.  See Jones v. Reynolds, ___ F.3d ___, No. 04-2320 (6th
Cir., Feb. 27, 2006).

In McQueen, the Sixth Circuit noted that Kallstrom was the
only post-DeShaney case in which the Court explicitly held that
the affirmative-act-plus-risk-creation requirement was satisfied.
McQueen, 433 F.3d at 465.  In the other cases listed in McQueen,
that requirement was missing, either due to the remoteness of the
act to the harm created, or to the lack of an affirmative act by
the state.  And McQueen concluded that the act of a schoolteacher
leaving a pupil with known violent tendencies alone and
unsupervised in a classroom with four other students, during
which time the pupil shot and killed one of the students, did not

-10-

satisfy the affirmative act plus risk creation requirement.

Here, giving Plaintiff the benefit of every reasonable inference, she has not established that the affirmative act of Turner's original foster care placement in November 2000 created or increased any risk to Plaintiff. Plaintiff's arguments are largely directed to her claim that the defendants **failed** to act - failed to properly supervise Turner, or to properly follow up on his living situation, or that they failed to remove Turner from the Carlisle home or to warn Plaintiff of his presence. These arguments are insufficient under well established Sixth Circuit precedent.

But even assuming that the affirmative act of the initial foster care placement was sufficient, the evidence properly in the record fails to establish that Turner's placement with Ms. Carlisle in November 2000 created a special danger to the Plaintiff, as opposed to a risk to the general public. As with the affirmative act requirement, the Sixth Circuit has set a "high bar for the special danger requirement." McQueen, 433 F.3d at 468. There must be a substantial increase in the likelihood that plaintiff **in particular** will face an increased risk of harm. As the Sixth Circuit most recently described this test, it requires that "the government could have specified whom it was putting at risk nearly to the point of naming the possible victim or victims." Jones v. Reynolds, slip op. at p. 8. In Jones, the court concluded that the special danger requirement was not met when plaintiff was one of approximately 150 spectators at an

illegal drag race that police officers on the scene failed to stop or control, and plaintiff was killed when one of the racers lost control of his car.

This case is more akin to <u>Kennerly v. Montgomery County Commissioners</u>, 257 F.Supp.2d 1037 (S.D. Ohio 2003), where a convicted criminal with a known dangerous and violent history was placed under house arrest by the county sheriff, and outfitted with a home monitoring device. At some point the criminal removed and destroyed his monitoring device. The county officials knew that the device had been removed and destroyed, but failed to take any steps to find or capture the criminal. Twelve days later he shot and killed a neighbor. The district court granted judgment to the municipal defendants, noting that

> a plaintiff cannot plead around <u>DeShaney</u>, and come within the ambit of the result reached in <u>Kallstrom</u>, merely by naming a more particular sub-class of the public as the group to which the government owed a duty, such as one's 'neighbors.' Neighbors are still the public. <u>Kallstrom</u> is not ambiguous: the government must be aware that its actions will increase the vulnerability of a specific individual to criminal danger.

<u>Kennerly</u>, 257 F.Supp.2d at 1044.

Here, Plaintiff apparently relies on the fact that when Turner was 14 years old, he attacked an older woman who was his neighbor. Plaintiff argues that the municipal defendants should have been aware that it was "much more likely" that Turner would attack Ms. Grant as opposed to someone in the general community. Plaintiff offers no specific evidence or testimony to support this assumption, and only cites portions of written comments in

-12-

various Turner records, to the effect that Turner was at risk of reoffending, or that he was expressing interest in sexual activity and watching pornographic movies at home. There is no mention that any risk Turner posed was any greater to close neighbors or to older women. And Plaintiff ignores the fact that Turner lived successfully with Ms. Carlisle for almost three years. During that time, there is nothing in the record suggesting that Turner was exhibiting any threatening behavior toward anyone, much less toward Ms. Grant.

Even if Plaintiff could establish a genuine dispute on this question (with properly authenticated documents or sworn testimony, neither of which Plaintiff has offered), Plaintiff must also establish that the municipal defendant "must have known or clearly should have known that its actions specifically endangered an individual." Kallstrom, 136 F.3d at 1066. In McQueen, the Sixth Circuit described this test as requiring "that the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." McQueen, 433 F.3d at 469 (internal citation and quotation omitted).

Here, the record simply does not support a conclusion that Turner posed a substantial risk of serious harm to Grant that any of the municipal defendants knew about, or were deliberately or recklessly indifferent to. Michael Cooper, Turner's Hamilton County MRDD caseworker, states that Jason was attending Diamond Oaks vocational school; that he saw Turner periodically between

-13-

September 2001 and July 2003 to assess his placement and his progress. Based on his observations and Turner's IEP from Diamond Oaks (Doc. 114, Cooper Exhibit L-4), Turner appeared to be relatively stable and seemed to be improving in many respects. Plaintiff cites one record, written by a Beacon Agency employee, stating that Ms. Carlisle was not home on two occasions and the "boys" in the home did not come to the door when the worker called. This document is not verified or explained, and cannot raise a genuine issue of disputed fact under Rule 56 about any of the moving defendants. Moreover, any inference that Ms. Carlisle was neglecting Turner is contradicted by Michael Cooper's sworn affidavit and the records of his visits with both Ms. Carlisle and Turner.

The facts of this case are indeed tragic. Ms. Grant's injuries are without doubt significant. However, based upon the undisputed facts and all reasonable inferences that can be drawn from them, Plaintiff has failed to establish a claim that the municipal defendants created a danger such that they should be liable for violating her constitutional rights. Summary judgment is therefore granted to the moving defendants.

Finally, Plaintiff also named the Montgomery County Commissioners, Montgomery County Job and Family Services, and an entity called "Montgomery County Youth Services" in her Fourth Amended Complaint. Each of these entities, and the three County Commissioners individually, moved for summary judgment (Doc. 83), essentially arguing that none of them had any responsibility for

or knowledge of Jason Turner.  Plaintiff's opposition (Doc. 103)
makes no specific allegations against these defendants, and is
limited to arguments directed to the Montgomery County Children
Services Board.  Plaintiff has not come forward with any evidence
showing a genuine issue of disputed fact or law concerning the
liability of the Montgomery County Commissioners, collectively or
individually, Montgomery County Job and Family Services, and an
entity Plaintiff calls the "Montgomery County Youth Services."
Therefore summary judgment is also granted to all of those
entities.

    Since the Court is dismissing Plaintiff's federal law
claims, the Court declines to exercise jurisdiction over
Plaintiff's state law claims against all the moving defendants,
and dismisses those claims without prejudice.  The Court finds
there would be no substantial savings in judicial resources from
resolving those claims at this time.  See Hankins v. The Gap,
Inc., 84 F.3d 797, 803 (6th Cir. 1996).

    In conclusion, the Court grants summary judgment on
Plaintiff's federal claims under 42 U.S.C. §1983 to defendants
The Resident Home; the Montgomery County Commissioners
collectively and the individual Commissioners Vicki Pegg, Charles
Curran and Donald Lucas; the Montgomery County Department of Job
& Family Services; the Montgomery County Youth Services; the
Montgomery County Department of Mental Retardation and
Developmental Disabilities; the Montgomery County Children
Services Board; and the Hamilton County Department of Mental

Retardation and Developmental Disabilities.  Plaintiff's state law claims against all the same defendants are dismissed without prejudice.  Defendants' joint motion to strike the Koustmer affidavit and its attachments (Doc. 108) is denied as moot.

**This case remains pending against defendant The Beacon Agency, Inc.**

SO ORDERED.

DATED: March 7, 2006                          s/Sandra S. Beckwith
                                      Sandra S. Beckwith, Chief Judge
                                       United States District Court

-16-